**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

TANISE JACKSON, individually and
as the Mother and Next Friend of
M.M., an infant,

               Plaintiffs,

v.                                        CIVIL ACTION NO. 3:14-15086

UNITED STATES OF AMERICA and
ST. MARY'S MEDICAL CENTER, INC.,
a West Virginia Corporation,

               Defendants.

**MEMORANDUM OPINION AND ORDER**

On May 9, 2016, a hearing was held on Plaintiff Tanise Jackson's Amended Petition to Approve Infant Settlement, ECF No. 250. Plaintiff Jackson brings this action, individually and on behalf of her infant son (the "minor plaintiff" or "M.M.") (collectively "Plaintiffs"), against the United States and St. Mary's Medical Center, Inc. ("St. Mary's") (collectively "Defendants") for claims arising from serious, life-long injuries sustained by the minor plaintiff during his birth at St. Mary's, a federally-qualified health center. After nearly two years of litigation, the Parties have settled Plaintiffs' claims, and now they ask the Court to approve those settlements pertaining to the minor plaintiff. At the settlement hearing, the Court approved all aspects of the proposed settlements, except the attorney's fees requested for the settlement with St. Mary's. This Opinion and Order considers the issue of what constitutes a reasonable attorney's fee for the minor plaintiff's settlement with St. Mary's. For the reasons stated on the record and in this Opinion and Order, the Court **GRANTS** the Amended Petition to Approve Infant Settlement, but for attorney's

fees on the settlement with St. Mary's, **AWARDS** a contingency fee at 33.3%, instead of the requested 40%.

## I.        Background

*A.  Facts*

On December 9, 2012, M.M. was born at St. Mary's while under the care of its physicians and nursing staff. Plaintiff Jackson is the biological mother of M.M; his biological father is not part of M.M.'s life. While Plaintiff Jackson awaited M.M.'s birth, she experienced labor difficulties caused by a drug administered to her called Picotin. In this suit, Plaintiff Jackson contends that nurses and doctors on St. Mary's staff should have noticed these difficulties by reading an electronic fetal monitor sooner than they did, and their alleged failure to notice these difficulties earlier constituted medical malpractice.

As a result of St. Mary's staff's alleged oversight, Plaintiff Jackson's uterus ruptured, and M.M. was deprived of oxygen and nutrients until he was later delivered through caesarian section. M.M.'s late delivery caused the injuries at the center of this dispute, namely hypoxic-ischemic encephalopathy, brain injury, cerebral palsy, cortical blindness, seizures, and spastic quadriplegia. M.M. will live with these injuries and be fed through a tracheal tube for the rest of his life. Experts say M.M. will live to be at least fifty years old, and he will need substantial medical care and equipment to survive to that age.[1]

M.M.'s medical insurance from birth to present-day has been provided by Medicaid. Medicaid paid for M.M.'s medical expenses in West Virginia, and for his care in Michigan, where Plaintiff Jackson moved the family after M.M.'s birth. The Michigan Department of Health and

---

[1] Plaintiff Jackson also suffered injuries due to M.M.'s improper delivery. Her uterus was completely ruptured, which along with M.M.'s birth injury, caused Plaintiff Jackson pain, suffering, and mental anguish.

Human Services ("Michigan DHHS") and West Virginia's Medicaid program ("First Recovery for Coventry") have both placed liens on any claim M.M. has based on his birth injuries; these liens have been negotiated down to a total of $263,305.60. M.M. must be able to retain his Medicaid insurance benefits in order for Plaintiff Jackson to be able to afford treating M.M.'s life-long medical needs.

Less than two weeks after giving birth, Plaintiff Jackson sought counsel to represent her in an action based on M.M.'s birth injuries. On December 19, 2012, ten days after delivering M.M., Plaintiff Jackson retained Beam & Raymond and Geoffrey N. Fieger to represent her and M.M. in this lawsuit on a 40% contingency fee basis.

### B. Procedural History

On April 21, 2014, Plaintiff Jackson brought the instant action on her and M.M.'s behalf by filing a aomplaint in this Court against St. Mary's and the United States.[2] Both Defendants denied all liability for any injuries Plaintiff Jackson and M.M. sustained during M.M.'s birth. To prosecute this hotly contested litigation, several other firms joined Beam & Raymond and Fieger in representing Plaintiffs. In total, four firms combined together to form Plaintiffs' Counsel, some specializing in the substance of neonatal malpractice law and others specializing in bringing such cases to trial.[3] Plaintiff Jackson was aware that these other firms joined the fold in representing her and her son.

---

[2] As a federally-qualified health center, St. Mary's operates under federal regulations that compensate St. Mary's for its compliance with federal rules and policies. The federal nature of St. Mary's led to the United States' alleged liability for any negligent care administered by staff at St. Mary's.

[3] Some of the attorneys composing Plaintiffs' Counsel possess special expertise in neonatal malpractice law and obstetrics that is discussed more fully in Part III.

After discovery commenced, both Defendants hired experts in obstetrics and gynecology, labor and delivery, maternal fetal medicine, causation, life-expectancy, and economics. St. Mary's also retained expert opinion on nursing standards of care. Numerous expert depositions took place all across the country. The information from these depositions was gathered and used to prepare for trial, both of which took substantial time and effort on the part of Plaintiffs' Counsel.

The Parties also engaged in mediation, which led to several weeks of back-and-forth settlement offers with Defendants and their insurers. In early 2016, the Parties came to a proposed settlement of all claims against Defendants. Because the settlements involve a minor, the Parties petitioned the Court to approve settlements of the minor plaintiff's claims. The Court appointed a Guardian Ad Litem ("GAL") pursuant to Federal Rule of Civil Procedure 17(c), to protect the interests of the minor plaintiff whose mother is suing on his behalf as next of friend.[4] Fed. R. Civ. P. 17(c)(2) ("A minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court must appoint a guardian ad litem— or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action.").

### C. Proposed Settlement, Petitions to Approve, Hearing, and Subsequent Developments

According to the original Petition to Approve Infant Settlement, the United States has agreed to an $8.5 million settlement, and St. Mary's agreed to a confidential settlement amount that is also quite substantial. The Parties proposed structuring the settlements as follows: (1) an irrevocable, reversionary inter vivos grantor medical care trust for the benefit of M.M. would be

---

[4] Initially, the Court appointed a GAL who also serves in Michigan as conservator over M.M.'s estate. But prior to the settlement hearing, the conservator notified the Court that he could not attend the hearing in person due to a medical issue. For this reason, the conservator was relieved from his GAL duties, and a local attorney was appointed as M.M.'s GAL.

created and purchased using $4.25 million from the United States' settlement, (2) an irrevocable special needs trust for the benefit of M.M., in accordance with 42 U.S.C. § 1396p(d)(4)(A),[5] would be created and funded with $2,012,848.43 from the gross settlement proceeds; (3) three annuities for the benefit of M.M would be purchased using gross settlement proceeds;[6] and (4) Plaintiff Jackson's claims will be settled for $250,000 out of the total settlement proceeds. The balance of the settlement fund will be used to pay certain expenses, and what is left after expenses would be placed into the special needs trust. The expenses incurred include: two medical liens resulting from medical care for M.M.'s birth injuries that amount to $263,305.60; litigation expenses incurred by Plaintiffs' Counsel totaling $187,345.97; fees for the Michigan court-appointed conservator of M.M.'s estate amounting to $12,000; GAL fees at $4,005; legal fees for researching and creating the special needs trust that total $6,100—with $4,500 of that cost of settlement to be paid by the United States; and attorney's fees. For attorney's fees, Plaintiffs' Counsel requested contingency fees at 25% of the United States' settlement,[7] which totals $2.125 million, and 40% of St. Mary's settlement. Plaintiffs' Counsel also proposed that it retain $100,000 for ninety days to pay any unexpected expenses billed after dispensing the settlement proceeds. After ninety days, Plaintiffs' Counsel would pay back any remaining principal plus interest accrued over the ninety-day period.

The original Petition to Approve Infant Settlement was inadequate and required revision because it lacked sufficient information to enable proper review of the proposed settlement.

---

[5] Under § 1396p(d)(4)(A), placing the settlement proceeds into a special needs trust for the benefit of the minor plaintiff, instead of having the minor plaintiff receive the funds directly, permits the minor plaintiff to retain his eligibility for Medicaid health insurance.

[6] The total cost of these annuities has been omitted from this Opinion and Order in an effort to keep the amount of St. Mary's settlement confidential, but the Court is aware of the total cost of these annuities.

[7] Plaintiffs' Counsel requested a 25% contingency fee on the United States' settlement because they understood the FTCA places a limit on the attorney's fees recoverable on Plaintiffs' claims against the United States.

Specifically, the original Petition failed to justify under Fourth Circuit precedent the requested attorney's fees, an analysis which requires applying to the instant case twelve factors from *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717 (5th Cir. 1974). *See In re Abrams & Abrams, P.A.*, 605 F.3d 238, 243 (4th Cir. 2010) (explaining "[d]istrict courts should look at the twelve factors first set forth in *Johnson*" when reviewing attorney's fees on claims involving minors). But the Court afforded Plaintiffs' Counsel a second chance and ordered them to file an amended petition prior to an already-scheduled hearing on the proposed settlement. The Court explicitly instructed Plaintiffs' Counsel to include in the amended petition an analysis of the *Johnson* factors, to attach supporting materials showing the time and labor expended by Plaintiffs' Counsel, to attach documentary support for the expenses allegedly incurred by Plaintiffs' Counsel, and to attach the written contingency fee agreement signed by Plaintiff Jackson.[8]

A hearing on the proposed settlement of the minor plaintiff's claims was held on May 9, 2016, with all Parties and the GAL present. During the settlement hearing, Plaintiff Jackson testified that she believed the settlement with Defendants is fair and reasonable for her and her son. She also stated that she was satisfied with Plaintiffs' Counsel's representation, and that Plaintiffs' Counsel had done everything she asked them to do in the course of the representation. Plaintiff Jackson also understands that this Court's approving the proposed settlement with Defendants will extinguish any claims she and her son hold against Defendants arising out of the minor plaintiff's birth.

---

[8] After Plaintiffs' Counsel failed to provide a signed, written fee agreement with the original Petition to Approve Infant Settlement, the Court ordered Plaintiffs' Counsel to provide such with the Amended Petition. Plaintiffs' Counsel complied, and the fee agreement signed by Plaintiff Jackson shows she agreed to a 40% contingency fee on any award to her and the minor plaintiff. Additionally, the 40% contingency fee was established by Plaintiff Jackson's testimony at the settlement hearing.

The GAL prepared a report prior to the hearing and testified at the hearing about the fairness of the proposed settlement. Before the settlement hearing, the GAL met with Plaintiff Jackson and Plaintiffs' Counsel. Although the GAL could not review every document filed in this case, he reviewed those he deemed most important, including the pleadings, briefing on motions for summary judgment, the Amended Petition to Approve Infant Settlement, a report prepared by the conservator of M.M.'s estate, the settlement document prepared by the Parties, and the following documents attached to the settlement document as support: expert opinions and plans prepared for M.M.'s life expectancy, life care, and medical management. The GAL's report found, among other things: 25% is the customary contingency fee for infant summary proceedings of this complexity; the FTCA caps attorney's fees on the settlement with the United States at 25%, which is a fair and reasonable attorney's fee given the complexity of this case; as for the settlement with St. Mary's, Plaintiff Jackson agreed to a 40% contingency fee, which despite being above the customary 25% fee, the GAL found to be fair and reasonable given the risks Plaintiffs' Counsel shouldered by taking this case, Plaintiffs' Counsel's experience, and the case's complexity. The GAL Report also found the remaining proposed expenses—medical liens, medical care trust, special needs trust, three specified annuities, litigation expenses, GAL fees, legal fees for consulting and creating trusts, and Plaintiff Jackson's settlement award—were fair and reasonable to the minor plaintiff. Lastly, Plaintiffs' Counsel's proposal about retaining $100,000 of the settlement proceeds for ninety days is a fair and reasonable method of paying any outstanding, unforeseen expenses, according to the GAL Report.

At the hearing, the GAL reiterated that he believes the settlement is in M.M.'s best interests, even if the Court awarded a 40% contingency fee instead of the lower fee his report found

customary. A fee higher than 25% might be warranted, the GAL opined, based on the challenges presented by this case, as well as the skill and knowledge of Plaintiffs' Counsel.

At the settlement hearing, the Court found the total settlement amount for the minor plaintiff's claims is fair and reasonable. The GAL and all parties agreed that the proposed $8.5 million settlement with the Government, and the proposed settlement with St. Mary's, will amply provide for the minor plaintiff's medical and personal needs well past his life-expectancy. Furthermore, issues of liability and damages were hotly contested by both Defendants. The evidence in Defendants' favor reveals uncertainty about both Defendants' liability for the minor's birth injuries. Although a jury could have awarded more than the settlement amounts obtained, it also could have awarded less or nothing at all. Accordingly, the Court found that the total of these settlement amounts was a fair and reasonable compromise of the minor plaintiff's claims against both Defendants.

The Court also found the settlement's structure—as presented by the parties in the Amended Petition and at the settlement hearing—is fair and reasonable. The Court approved using principal settlement proceeds to purchase a reversionary medical needs trust, the special needs trust, and the three proposed annuities. Together, these purchases will guarantee that the minor plaintiff has access to living expenses and adequate medical care for the rest of his life. The medical needs trust will pay the minor plaintiff's medical expenses at least up to his expected life-span; the annuities will amply provide for M.M.'s living expenses; and the special needs trust will guarantee his medical care should he live past the life expectancies projected by experts hired by both parties.

As for proposed payments from the gross settlement fund, the Court approved each of these as fair and reasonable, except for part of the requested attorney's fees. More specifically, the Court approved paying the two reduced medical liens, as these expenses were incurred in treating the

minor plaintiff's birth injuries. Plaintiff Jackson's portion of the settlement proceeds is fair and reasonable to the minor plaintiff. Litigation expenses incurred by Plaintiffs' Counsel in the amount of $187,345.97 were also approved. Fees for the conservator of M.M.'s estate were approved because the Parties stated his services billed for were used by Plaintiffs' Counsel in prosecuting this litigation; accordingly, this $12,000 fee will be paid for in equal proportions by St. Mary's and Plaintiffs' Counsel. The GAL's fees, which amounted to $4,005, were also approved, to be paid by St. Mary's. Plaintiffs' Counsel's request to retain $100,000 of settlement proceeds for ninety days in order to pay any unexpected expenses that may appear in that time was also approved, provided that the conservator must approve paying any such expense before disbursement of settlement proceeds, and that after the ninety-day period elapses, any remaining principal plus interest shall be repaid by Plaintiffs' Counsel into the special needs trust.

Regarding the requested attorney's fees, the Court made several findings before concluding the settlement hearing. First, the Court found that the FTCA's 25% cap on contingency fees applied to the settlement with the United States, and that a 25% contingency fee on the United States' settlement would be fair and reasonable to the minor plaintiff. Considering the settlement with St. Mary's, the Court reviewed the Amended Petition and found it still lacked adequate discussion of the *Johnson* factors. The Court's preliminary *Johnson* analysis led it to conclude that although a 40% contingency fee is not uncommon, a 40% fee on the settlement with St. Mary's would be excessive due to that settlement's amount. Instead, a 33.3% contingency fee on the St. Mary's settlement would be a fair and reasonable fee. Notwithstanding this preliminary conclusion, Plaintiffs' Counsel was given a third shot at filing a brief with an adequate *Johnson* explication showing how a 40% fee would be fair and reasonable.[9] Plaintiffs' Counsel attempted to do so by

---

[9] The first shot being the Petition to Approve Infant Settlement, the second being the Amended

filing its Statement in Support of Attorney's Fees, ECF No. 255, which the Court considers in this Opinion and Order.[10]

Having introduced the relevant background for deciding Plaintiff Jackson's Amended Petition to Approve Infant Settlement, Part II will explain the legal standard for reviewing settlements of minors' claims, and Part III will discuss the only remaining issue in approving this settlement—attorney's fees on the minor's settlement with St. Mary's.

## II.    Legal Standard

Where a proposed settlement involves a minor, the district court has a "duty to protect the minor's interests," because minors may be "especially vulnerable to manipulation" and "unable to protect themselves." *Abrams*, 605 F.3d at 243. "[I]nvestigation and examination of a proposed minor settlement includes a review not only of the total settlement amount, but also of the disposition of the settlement proceeds, including requested payments to others, such as attorneys or medical providers." *Gorham v. Amusements of Rochester, Inc.*, No. 14–386, 2015 WL 2454261, at *3 (M.D.N.C. May 22, 2015). With regard to attorney's fees on a minor's claim, district courts do not have carte blanche to approve or deny the requested fee, and instead, must scrutinize the fee for reasonableness by applying twelve factors from *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974) to evidence before the Court. *Abrams*, 605 F.3d at 243–44.

Even where a parent on behalf of a minor-client has agreed to a fee before the representation, the court must review the agreed upon fee for reasonableness. *See Abrams*, 605 F.3d at 240; *Jenkins v. McCoy*, 882 F. Supp. 549, 555 (S.D.W. Va. 1995); *Gorham*, 2015 WL

---

Petition, and the third shot is the Statement in Support of Attorney's Fees.

[10] After the settlement hearing, Plaintiff Jackson contacted the Court to inquire about the status of settlement because, according to her, attorneys composing Plaintiffs' Counsel would not speak directly to her. Refraining from advising her directly, the Court directed Plaintiffs' Counsel to respond to Plaintiff Jackson's inquiries.

2454261, at *3; *see also Blanchard v. Bergeron*, 489 U.S. 87, 92 (1989); *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161, 164 (5th Cir. 1981). An agreed upon fee is but a single factor in assessing the reasonableness of requested attorney's fees and is not dispositive in calculating a reasonable fee. *See Blanchard*, 489 U.S. at 93 (discussing *Johnson* factors in context of fees requested under Civil Rights Attorney's Fees Act). Not all fee agreements will be reasonable. A certain fee for representing an adult client who is fully competent may not be reasonable in a case where the client is an incapacitated minor.

Applying the *Johnson* factors to the unique circumstances in each case will determine whether a certain fee is reasonable or not. The Fourth Circuit has stated the *Johnson* factors as follows:

> (1) the time and labor required in the case, (2) the novelty and difficulty of the questions presented, (3) the skill required to perform the necessary legal services, (4) the preclusion of other employment by the lawyer due to acceptance of the case, (5) the customary fee for similar work, (6) the contingency of a fee, (7) the time pressures imposed in the case, (8) the award involved and the results obtained, (9) the experience, reputation, and ability of the lawyer, (10) the undesirability of the case, (11) the nature and length of the professional relationship between the lawyer and the client, and (12) the fee awards made in similar cases.

*Abrams*, 605 F.3d at 244.

### III.    Discussion

In the Amended Petition, Plaintiff Jackson asks the Court to approve the settlement that Plaintiffs' Counsel negotiated on the minor plaintiff's behalf with the United States and St. Mary's. Having resolved at the settlement hearing all other issues posed by the Amended Petition, the remaining issue for the Court to analyze is the reasonableness of the attorney's fees requested on the minor's settlement with St. Mary's. This final task requires applying *Johnson's* twelve factors

to evidence adduced in this case and determining whether a 40% contingency fee on the St. Mary's settlement is reasonable, and if 40% is excessive, setting a reasonable fee.[11]

1. **Time and labor.** Judging from the time it took to litigate this case, the extent of discovery completed, documents filed, and negotiations conducted, Plaintiffs' Counsel devoted substantial time and resources to secure this settlement. This case took a little over two years to prosecute. Although it stopped short of trial—a time and resource drain—discovery was completed. Discovery required reviewing voluminous, plentiful medical records and conducting depositions of experts on medical standards of care and life expectancy. According to the Amended Petition and Attorney's Fees Statement, over 5,000 pages of medical records were reviewed by Plaintiffs' Counsel. Plaintiffs' Counsel has also provided time logs documenting the total time they expended on this case, which is very helpful for this Court's review, *see Gorham*, 2015 WL 2454261, at *5 (noting attorneys failed to submit documentation supporting the requested contingency fee and awarding fee lower than requested). The time logs show Plaintiffs' Counsel spent over 3,000 hours on this case, not including the more than 1,300 hours put in by support staff. The time spent and total number of documents reviewed are both substantial. *See Williams*, 2015 WL 127862, at *7 (noting attorneys' documentation showed they completed 3,800 hours of work, exchanged over 7,600 e-mails, reviewed over 3,000 documents, called each other late at night, travelled

---

[11] One of Plaintiffs' Counsel's justifications for awarding a 40% contingency fee must be rejected right out of the gate because following its rationale would violate Congressional policy. Plaintiffs' Counsel notes Plaintiff Jackson agreed to a 40% contingency fee on all claims, but the FTCA caps attorney's fees on claims against the United States at 25%. Therefore, awarding a 40% fee on the settlement with St. Mary's, according to Plaintiffs' Counsel, is justified because it would bring the total combined contingency fee closer to 33.3%, which the Court determined as a preliminary matter is a reasonable fee in this case. This reason for granting a 40% contingency fee must be categorically rejected. Congress has made a policy decision that 25% is an appropriate attorney's fee in FTCA cases. The Court cannot frustrate federal policy by granting attorney's fees on one settlement award to offset a statutory limit on attorney's fees set forth in the FTCA.

internationally, conducted a mock trial, and set aside holiday and vacation time to prosecute the plaintiff's medical malpractice claim).

Although Plaintiffs' Counsel committed an amount of time and labor that was substantial, the time and labor put into this case was not far above average in prosecuting similar medical malpractice cases. Medical malpractice cases like this require hiring multiple experts to prove matters such as the standard of care and life expectancy. Furthermore, while the Court commends Plaintiffs' Counsel on such a successful settlement, this is not a case where Plaintiffs' Counsel had to go to trial to achieve an award that approaches the maximum value of the case. And although the time logs show a substantial amount of time was spent prosecuting this case, having four different law firms represent Plaintiffs undoubtedly created some level of redundancy in lawyer time spent on this case, and this redundant time should be, but cannot be, excluded from consideration under the time and labor factor. As such, the time and labor factor weighs in favor of awarding the average contingency fee for cases of this type, which is discussed under the *Johnson* factor considering fee awards in similar cases.

**2. Novelty and difficulty of the questions presented.** "Cases of first impression generally require more time and effort on the attorney's part." *Johnson*, 488 F.2d at 718. To be clear though, this factor considers the novelty or complexity of issues of law, not the amount of time put into a case by attorneys, which is the subject of the previous factor, or the expertise required to litigate in a certain field of law, which is considered in the experience factor.

The claims in this case—premised on the minor plaintiff's injury during birth—presented no novel question of law. This case did involve questions more difficult than typical medical malpractice liability and damages recoverable, but not more difficult than questions in this sort of case, one alleging neonatal malpractice. Neonatal malpractice, a subfield within medical

malpractice, presents more factual difficulties than a run-of-the-mill medical malpractice case. Plaintiffs' Counsel does not argue that any part of this case posed a particularly difficult question of fact or law *within the subfield of neonatal malpractice*. The general difficulty of litigating a neonatal malpractice case is accounted for under the *Johnson* factor regarding Plaintiffs' Counsel's experience and specialty. The Court must be careful in applying the *Johnson* factors not to conflate the factors by inappropriately double-counting some facts.

One part of this case does present legal questions more difficult than a typical medical malpractice case. The United States was a defendant pursuant to the FTCA, which raises threshold issues of sovereign immunity and FTCA liability, as opposed to simpler issues under state law of malpractice liability for non-governmental entities. As such, the novel or difficult question of law factor weighs slightly in favor of awarding a higher than average fee.

**3.  Skill required.** Under the skill factor, courts consider counsel's work product, preparation, and general ability displayed to the court. *Johnson*, 488 F.2d at 718. Plaintiffs' Counsel notes this case required lawyers experienced in neonatal malpractice, a medical malpractice specialty. While it is true that lawyers handling neonatal malpractice cases must understand the science behind birth, this consideration is more appropriate for the experience factor discussed below.

Plaintiffs' Counsel's practice before this Court has been limited to this proceeding, and the little bit revealed about their ability and skill was mixed. While Plaintiffs' Counsel has demonstrated expertise in the subject matter underlying this dispute—expertise which led to these ample settlements, Plaintiffs' Counsel's troubling instance of client miscommunication undermined confidence in their ability and skills as lawyers.

Additionally, Plaintiffs' Counsel's attempts to support their requested attorney's fees have been insubstantial. It took three rounds of briefing on the issue of attorney's fees for Plaintiffs'

Counsel to offer an analysis of the *Johnson* factors that considered case law, which the Court has requested since round one. In the second round, Plaintiffs' Counsel failed to produce the contingency fee agreement as ordered by the Court. In the third round, Plaintiffs' Counsel produced an Attorney's Fees Statement that included some legal analysis, affidavits, and time logs, but the Statement's legal analysis still improperly conflated *Johnson's* factors in a way that could have been avoided by researching cases applying those factors. In sum, what little experience the Court had dealing with Plaintiffs' Counsel was not impressive.

Considering Plaintiffs' Counsel's work product, preparation, and ability displayed to this Court, including a troubling instance of client miscommunication and three rounds of briefing on the attorney's fees issue, Plaintiffs' Counsel's skills were at best commensurate with other attorneys prosecuting medical malpractice cases before this Court. This was not a case that required skill in handling any special matters, such as media coverage or interplay between criminal and civil matters. *See Gorham*, 2015 WL 2454261, at *11. (involving both media and criminal charges). Considering all this, the skill factor weighs in favor of awarding a fee proportionate to average work product, preparation, and ability—in other words, awarding a fee at a customary contingency rate.

**4.   Preclusion of other employment.** Courts are justified in awarding higher fees to attorneys who demonstrate they sacrificed other lucrative cases to take on the instant representation, and to solo practitioners, who presumably must forgo other cases. *See Williams*, 2015 WL 127862, at *9. This factor should not be conflated with the time and labor factor by considering the time demands of the instant case.

Here, the only information about the instant matter precluding Plaintiffs' Counsel from taking other work is found in the Amended Petition, which represents that this case's complexity

and cost limited the number of other cases an attorney could take in a given year. But every case an attorney undertakes fills a spot on the attorney's workload that could have been filled by another case. To have this factor weigh in its favor, a firm must demonstrate preclusion of other employment, not just allege it. And firms may demonstrate preclusion of other work by showing the instant matter consisted of a significant proportion of the firm's total work during the time period of the representation. By providing only sweeping statements about the amount of time this case required, Plaintiffs' Counsel has not demonstrated the instant representation precluded other work. Furthermore, Plaintiffs' Counsel is composed of attorneys at four different firms, none of whom are solo practitioners. A case that does not foreclose many or all other employment opportunities, as this one appears to be, merits awarding a customary fee or one close to those awarded in similar cases.

**5. Customary fee for similar work.** Under the customary fee factor, a court looks to the "customary fee for similar work in the community." *Johnson*, 488 F.2d at 718. In this case, the GAL found a customary fee for infant summary proceedings is 25%. Case research suggests a 33.3% contingency fee is customary in the Fourth Circuit for medical malpractice cases involving minors or incompetent persons. *See, e.g.*, *Williams v. Old HB, Inc.*, No. 13–00464, 2015 WL 127862, at *6 (W.D. Va. Jan. 8, 2015); *Gorham*, 2015 WL 2454261, at *12. The Amended Petition asserts Plaintiffs' Counsel's customary fee is 40%. It may be true that Plaintiffs' Counsel charges 40% customarily, but that has no bearing on this factor. The Amended Petition also states, without support, that lawyers in West Virginia and across the country sometimes charge 45% for medical malpractice cases. The Statement in Support of Attorney's Fees includes affidavits from three attorneys, all well-experienced and practicing in West Virginia, who claim that a 40% contingency fee is now the norm in medical malpractice cases. One of these attorneys claims he sometimes

-16-

charges up to 45%, depending on the complexities of the case. Even if attorneys in West Virginia and across the country sometimes charge 45%, this does not mean that 45% is a customary fee. Relying on the GAL report, case research, and affidavits submitted by Plaintiffs' Counsel, the customary fee for this sort of case lies somewhere between 25% and 40%. Taking the average of these findings, the customary fee factor weighs in favor of dipping below a 40% contingency fee to somewhere near 33.3%.

**6. Contingency of fee.** Under the contingency of fee factor, courts consider counsel's expectations at the outset of litigation regarding the fee rate and risks faced by counsel in undertaking the representation. *Johnson*, 488 F.2d at 718; *Williams*, 2015 WL 127862, at *6. Courts should also factor into their analysis the important role that contingency fees play in providing counsel to clients who are impoverished. *Abrams*, 605 F.3d at 245–46.

In this case, Plaintiff Jackson agreed, on her behalf and her son's, to pay Plaintiffs' Counsel 40% on any proceeds from Plaintiffs' claims. No doubt, the contingency fee agreement in this case was the key that opened the courthouse door for Plaintiff Jackson and the minor plaintiff. *Abrams*, 605 F.3d at 246. However, this was a highly desirable case to bring, involving sympathetic plaintiffs and promising a lucrative recovery against a party with deep pockets. Because this case was desirable among plaintiffs' attorneys, general principles underlying the usefulness of contingency fees apply to a lesser degree.

The contingency of fee factor also considers risks faced by attorneys undertaking the case. This case presented a neonatal malpractice claim that required Plaintiffs' Counsel to front over $180,000 in expenses, which even when repaid, will not be repaid with interest. Additionally, the case presented no guaranty of recovery for Plaintiffs, even if they were very sympathetic to a potential jury, because the minor plaintiff's life expectancy was uncertain, and because Defendants

had theories and evidence in their defense on the malpractice liability issue. Any risk incurred, however, was spread across four law firms that represented Plaintiffs, making the contingency of recovery in this case less risky for Plaintiffs' Counsel. Despite the shared risk Plaintiffs' Counsel enjoyed, the prospect of Plaintiffs recovering an award in this case was uncertain enough that, considering the important purpose of contingency fees along with Plaintiffs' Counsel's expectations at the outset, this factor weighs in favor of the agreed upon contingency fee.

    **7. Time pressures imposed.** "Priority work that delays the lawyer's other legal work is entitled to some premium. This factor is particularly important when a new counsel is called in to prosecute the appeal or handle other matters at a late stage in the proceedings." *Johnson*, 488 F.2d at 718. The circumstances of this case presented no time pressures as contemplated by *Johnson*. As such, the time pressures factor weighs in favor of awarding a fee that is not considered "premium," but rather, closer to the customary fee for medical malpractice cases.

    **8. Award involved and results obtained.** "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Abrams*, 605 F.3d at 247. In this case, Plaintiffs' Counsel obtained settlement amounts that constitute a significant result for both Plaintiffs, considering the contested issues of liability and damages, as wells as the evidence favoring Defendants. Had the Parties gone to trial, the sum could have been more, but it also could have been less. The total settlement will be enough money to care for the minor plaintiff for the rest of his life, even if he lives to the age of 70, according to the conservator of M.M.'s estate. Moreover, Plaintiff Jackson has indicated she believes the agreed upon 40% contingency fee is in the best interests of her son, the minor plaintiff, and she asks this Court to approve the requested contingency fee on St. Mary's settlement. Although the incapacitated minor plaintiff is unable to voice any opinion on the fee, the GAL appointed to protect his interests has found the 40%

contingency fee is fair and reasonable and asked this Court to award a 40% fee. To be sure, "a court must independently investigate and evaluate any compromise or settlement of a minor's claims to assure itself that the minor's interests are protected, even if the settlement has been recommended or negotiated by the minor's parent or guardian ad litem." *Abrams*, 605 F.3d at 247 (citation and quotation omitted). Nevertheless, Plaintiffs' Counsel's triumph in settling this case for a sizeable sum, along with Plaintiff Jackson and the GAL's belief that the agreed upon fee is reasonable, all weigh in favor of awarding the agreed upon contingency fee.

**9. Experience, reputation, and ability of the lawyer.** Attorneys with experience or specializations are expected to receive larger compensation than greenhorn attorneys. *See Johnson*, 488 F.2d at 719. Under this factor, the Court considers evidence submitted by the Parties regarding the experience, reputation, and ability of Plaintiffs' Counsel.

Plaintiff's Counsel has not submitted to the Court their curricula vitae, but they have filed affidavits by attorneys from West Virginia regarding Plaintiffs' Counsel's experience, reputation, and specializations. One affidavit states certain attorneys representing Plaintiffs have "quite remarkable" experience in obstetrical malpractice cases, while other attorneys representing Plaintiffs have exceptional trial skills that make all their cases more valuable. Defense Counsel has not spoken about their experience litigating against Plaintiffs' Counsel.

The Amended Petition and Attorney's Fees Statement indicate that Plaintiffs' Counsel consists of highly-skilled, experienced lawyers, who have specialties in neonatal malpractice law, and who enjoy regional and national reputations for obtaining large verdicts for their clients. Several of the attorneys have practiced for more than thirty-five years. One of Plaintiffs' attorneys is a star on the Fox television network's Power of Attorney and a CBS radio program about law; he also regularly appears on law-related shows presented on other television stations and has "won

-19-

more multimillion dollar awards than any other attorney in the country." Amended Petition, at 18.

Representations in the Amended Petition, Attorney's Fees Statement, and affidavits support finding the experience, specialization, reputation, and ability of Plaintiffs' Counsel weigh in favor of a contingency fee suitable for well-experienced, highly-regarded, and skilled attorneys, which presumably is reflected in the agreed upon fee.

**10. Undesirability of the case.** "Undesirability and relevant risks of a case must be evaluated from the standpoint of plaintiff's counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight." *Williams*, 2015 WL 127862, at *9.[12] This is the sort of case that plaintiffs' attorneys find highly desirable. The nature and circumstances of the minor plaintiff's injury were such that some liability and a large pay-out were promised from the get-go, even if not assured as litigation progressed. An incapacitated minor plaintiff is also a very sympathetic client to represent. And the inclusion of the federal government as a defendant ensured that any judgment for damages would be recoverable. This case is unlike the civil rights cases contemplated in *Johnson*, which because of their unpleasant reception by a misunderstanding community could result in a negative economic impact on the attorney's practice. *Johnson*, 488 F.2d at 719. At bottom, the factual circumstances and defendants in case made it highly desirable among plaintiff's attorneys. For that reason, this factor weighs in favor of awarding a customary fee.

**11. Nature and length of the professional relationship between lawyer and client.** The nature of the relationship between lawyer and client is a particularly important factor in this case. While seeking counsel, Plaintiff Jackson was particularly vulnerable. She had recently given birth

---

[12] The Court is careful not to conflate analysis under this factor regarding risk with analysis under the contingency of fee factor regarding the risks that Plaintiff's Counsel undertook in agreeing to represent Plaintiffs. Accordingly, the risk to Plaintiffs' Counsel of losing this litigation is not considered here, but rather, under the contingency of fee factor.

to a severely injured child requiring immediate, constant, and expensive medical treatment. At that time, she was a single-parent racking up medical bills with no hope of ever being able to pay them.[13] Consequently, Plaintiff Jackson also faced uncertainty about her son's continued medical care. Just ten days after giving birth, and still suffering from injuries giving rise to this dispute, Plaintiff Jackson retained Plaintiffs' Counsel to represent her and her son. Because this is her first, and hopefully last, medical malpractice case, Plaintiff Jackson is an unsophisticated consumer of legal services. Plaintiff's Counsel, on the other hand, has vast experience in medical malpractice cases, as discussed above, under the experience factor. Experience informs attorneys how to negotiate with potential clients, including how to procure desirable fees. There is no indication Plaintiffs and their counsel, composed of attorneys at four different firms, had any relationship before this proceeding or that they will continue a relationship after this case is settled. All of these circumstances—Plaintiff Jackson's vulnerable state, the proximity of injury to retaining counsel, imbalanced legal sophistication—weakened Plaintiff Jackson's ability to bargain, on her behalf and the minor plaintiff's, in retaining Plaintiffs' Counsel. Thus, the nature and length of the professional relationship factor weighs strongly in favor of a fee not higher than customary or awards in similar cases.

**12. Fee awards in similar cases.** The contingency fee award in medical malpractice cases like this one—cases involving a minor or incompetent person—is usually 33.3%. *See Williams*, 2015 WL 127862, at *6, 11 (collecting cases and noting a one-third contingency fee is standard in personal injury cases involving incompetent, adult plaintiff). Congress has capped attorney's fees in FTCA medical malpractice cases at 25%. In other medical malpractice cases, a 40% fee is not unheard of, and indeed, may be appropriate in many circumstances. Particularly, a 40% fee might

---

[13] Plaintiff Jackson has extremely low income, considering that her son qualifies for Medicaid.

be appropriate where the plaintiff alleging medical malpractice is an adult with full mental capacity. An adult with full mental capacity is capable of bargaining with prospective counsel over attorney's fees. In cases like this, however, one plaintiff, an incapacitated minor, has no bargaining power and must rely on another plaintiff to negotiate a contingency fee. Courts are duty-bound to protect the interests of minors and people who are incompetent. Other courts have found a 33.3% contingency fee was appropriate in similar cases, i.e., ones involving a plaintiff who is a minor or incompetent person. *See Williams*, 2015 WL 127862, at *6 (attorney charged 33.3% contingency fee instead of typical 40% fee because the plaintiff suffered a catastrophic bicycling injury leaving him incompetent); *Boatright ex rel. Boatright v. R.J. Cormon R.R. Co./Material Sales*, 244 Fed. App'x 312, 314 (11th Cir. 2007) (affirming district court's finding that agreed-upon 40% contingency fee was excessive in light of incompetent plaintiff's Alzheimer's disease); *see also Gorham*, 2015 WL 2454261, at *4 (assuming 33.3% was common fee for representing client severely injured by amusement park ride but finding lower fee appropriate because, in part, attorney represented a minor). Looking to other cases, a fee higher than 33.3% is uncommon where attorneys represent clients who are minors or incompetent, because, in part, such clients lack the mental ability to bargain and legal authority to contract. Therefore, considering other medical malpractice cases brought on behalf of minor or incompetent clients, a 33.3% fee is reasonable, and a 40% fee for representing a minor in a settling medical malpractice case would be excessive.

To conclude, applying *Johnson's* factors to the instant case, the Court **FINDS** the requested 40% contingency fee exceeds a reasonable attorney's fee for the settlement of the minor plaintiff's claims. Although the goal of contingency of fees, experience and reputation of Plaintiff's Counsel, and results obtained all weigh in favor of awarding the requested 40% fee, and despite the novel or difficult question factor leaning slightly toward a higher than customary fee, the remaining

-22-

factors weigh strongly in favor of a 33.3% fee—the percentage awarded customarily and in similar cases. The time and labor put into this case was not far above average; Plaintiffs' Counsel demonstrated average skills and did not show they were substantially precluded from other employment; customarily, a contingency fee around 33.3% has been awarded in similar, settling neonatal malpractice cases brought on behalf of minors; this case imposed no special time pressures and was highly desirable among plaintiffs' attorneys, and most importantly, the individual bargaining on behalf of the minor was put in a position of extreme disadvantage by her circumstances. Awarding a fee less than that requested by Plaintiff's Counsel and agreed to by Plaintiff Jackson is no light decision, but applying *Johnson's* factors to the instant minor's settlement, it is what this Court is duty-bound to do. Accordingly, the appropriate contingency fee for bringing the minor plaintiff's claims to settlement is 33.3%, not the 40% requested by Plaintiffs' Counsel.

## IV.    Conclusion

For the reasons above, the Court **GRANTS** the Amended Petition to Approve Infant Settlement, but for attorney's fees, **AWARDS** a contingency fee at 33.3%, instead of the requested 40% rate. Considering the minor plaintiff's interests in each proposed settlement, the Court **FINDS** and **RULES:**

- The total amount of the proposed settlements with the United States and St. Mary's is fair and reasonable;

- The structure of the proposed settlements is fair and reasonable;

- The expenses proposed in the Amended Petition to Approve Infant Settlement, except for part of the proposed attorney's fees, are fair, reasonable, and incurred in connection with this litigation;

- For attorney's fees, a 25% contingency fee on the settlement with the United States is fair and reasonable, and a 33.3% contingency fee on the settlement with St. Mary's is fair and reasonable;

- Plaintiffs' Counsel may retain $100,000 of the settlement proceeds for a period of ninety days, as proposed in the Amended Petition to Approve Infant Settlement, for the purpose of paying any unexpected expenses incurred in this litigation, provided that: (1) the Michigan court-appointed conservator over M.M.'s estate approves any proposed expense before settlement proceeds are used to pay such expense, and (2) when ninety days has elapsed, Plaintiffs' Counsel shall repay the remaining retained settlement proceeds plus interest accrued;

- Any settlement proceeds remaining after the proposed expenses have been paid shall be placed in the special needs trust for the benefit of M.M.;

- After all expenses have been paid, Plaintiffs' Counsel shall submit to the Court under seal a closing statement reflecting its compliance with this Opinion and Order.

Based on these findings and rulings, the Court **DISMISSES WITH PREJUDICE** this civil action against Defendant St. Mary's Medical Center, Inc. Additionally, the Court **ENTERS** the following accompanying Order Approving Infant Settlement with the United States, which shall be unsealed.

The Court **DIRECTS** the Clerk to send a copy of this Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        Jul 13, 2016

ROBERT C. CHAMBERS, CHIEF JUDGE

-24-